IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

MOKE AMERICA LLC,
     Plaintiff,

v.                                       Civil No. 3:20cv400 (DJN)

AMERICAN CUSTOM GOLF CARS, INC., *et al.*,
     Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on the parties' cross-motions for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c). By separate order, the Court will enter judgment for Plaintiff on Count I of the Amended Complaint (ECF No. 20) and Counts I, II and III of Defendants' Third Amended Counterclaims (ECF No. 146). On Counts II and III of the Amended Complaint, the Court will enter judgment for Defendants. This opinion contains the Court's findings of fact and conclusions of law with respect to the parties' motions pursuant to Rule 52(a) and (c).

## I.     LEGAL CONTEXT

### A.    Introduction

The instant suit, before the Court on appeal from the Trademark Trial and Appeal Board ("TTAB"), sounds in trademark law. The parties, both dealers in low-speed, open-air electric vehicles, compete for the United States rights to the "MOKE" mark. The claims and counterclaims in the case mirror each other, as both Plaintiff and Defendants seek (1) review of the TTAB's decision below, (2) a declaration of trademark ownership, and (3) a judgment against their counterpart for trademark infringement. The Court ultimately resolves the case on

the contested mark's validity, finding that neither side has established ownership rights in the mark, a generic term unfit for trademark protection. Because the factual and procedural background of this case is best digested with an understanding of the legal context in which the case arises, the Court first discusses the germane legal principles before describing the case in detail.

### B.   Applicable Legal Principles

Trademark law serves two related goals. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 782 n.15 (1992). First, trademark rights protect the public against commercial deception, assuring the consumer that when he "purchas[es] a product bearing a particular trademark [that he] knows, [he] will get the product which [he] asks for and wants to get." *Id.* Second, trademark protections shore up the property interests of trademark owners, shielding their expenditures of "energy, time, and money," and the resulting corporate goodwill, from "misappropriation by pirates and cheats." *Id.*

In furtherance of these two ends, the Lanham Act provides multiple means through which an entity may protect its trademark. For one, the United States Patent and Trademark Office ("USPTO") "administers a federal registration system for trademarks," *Iancu v. Brunetti*, 139 S. Ct. 2294, 2297 (2019), whereby registered trademarks are published for public consumption on the USPTO's Principal Register. 15 U.S.C. § 1057. The listing of a mark on the Principal Register, though neither necessary nor sufficient to establish trademark ownership, confers several "procedural and substantive legal advantages" on registrants vis-a-vis those who rely strictly on common law trademark rights. 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:9 (5th ed. 2019). For example, federal registration constitutes "prima facie evidence" of a mark's validity, 15 U.S.C. § 1115(a), and serves as "constructive notice" to

2

third parties "of the registrant's claim of ownership," *id.* § 1072.

Registration decisions fall in the first instance to the USPTO's Examining Attorneys, who wield the power to grant or deny registration applications in whole or in part. Decisions of the Examining Attorneys are then appealable to the USPTO's Trademark Trial and Appeal Board, which also hears *inter partes* disputes between trademark applicants and interested third parties — in trademark parlance, "opposers" — who file a notice of opposition and move the USPTO to deny an applicant's pending registration. Decisions of the TTAB are in turn appealable in federal court, either via direct appeal to the Court of Appeals for the Federal Circuit under § 1071(a)(1) or by initiation of a new civil action in federal district court under § 1071(b). In appeals pursuant to § 1071(a)(1), the Federal Circuit limits its appellate review, much like its sister courts of appeal, to the factual record submitted before the TTAB. When a party appeals the TTAB's decision through a § 1071(b) action, on the other hand, the parties may supplement the record with new evidence. A district court hearing a § 1071(b) appeal "reviews the record de novo" and enjoys "authority independent of the USPTO to grant or cancel registrations and decide any related matters[,] such as infringement and unfair competition claims." *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014).

As another means of trademark protection, the Lanham Act provides a private right of action for trademark infringement — a right of which the holders of registered and unregistered marks alike may avail themselves. 15 U.S.C. §§ 1114 (registered), 1125(a) (unregistered). To prevail on a claim of trademark infringement, the plaintiff must show that (1) it owns a valid, protectable trademark, and (2) "that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among customers." *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162,

171 (4th Cir. 2006). Only the first element of the prima facie infringement claim — ownership of a valid, protectable mark — is in dispute in this case.

Ownership rights to unregistered trademarks — the type of trademark at issue here — flow from two necessary conditions: (1) priority of use of (2) a valid, protectable mark. *George & Co. LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 400 (4th Cir. 2009). Priority of use accrues to the individual or entity that first appropriates the mark for commercial gain. *Id.* Stated differently, the party asserting priority in a mark must be the first to use the mark in connection with the sale of goods or services, or, at a minimum, must demonstrate that it used the mark before the party against which it asserts its putative rights. *Id.*; *see also Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 267 (4th Cir. 2003) ("At common law, trademark ownership is acquired by actual use of the mark in a given market.").

As to the second half of the ownership inquiry, a mark proves valid and thus protectable only where the mark possesses sufficient distinctiveness to perform the quintessential trademark function: identification of its user as the source or origin of the marked product. *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) ("Eligibility for protection depends upon the market's association between the particular mark and the goods or the business . . . ."); *Anti-Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 304 (9th Cir. 1979) ("It is the source-denoting function which trademark laws protect, and nothing more."). The protectability component of trademark ownership speaks to the nature of the mark itself, asking whether the mark constitutes the sort eligible for the protections afforded by trademark status. This inquiry turns on a mark's capacity to create an immediate association in the minds of consumers between the mark and its user. *In re Chem. Dynamics, Inc.*, 839 F.2d 1569, 1571 (Fed. Cir. 1988) (a mark proves worthy of protection where it "creates a separate and distinct commercial impression,

4

which thereby performs the trademark function of identifying the source of the merchandise to the consumers").

In the Fourth Circuit, as elsewhere, a mark's protectability is in part a function of its distinctiveness. *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996) ("The protection accorded trademarks is directly related to the mark's distinctiveness."). Courts use the typology announced by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976), to assess distinctiveness, separating marks into one of five categories. In declining order of distinctiveness, the *Abercrombie* typology categorizes marks as (1) arbitrary, (2) fanciful, (3) suggestive, (4) descriptive or (5) generic. *OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 340 (4th Cir. 2009) (applying the *Abercrombie* framework).

Arbitrary marks "are based on existing words used in ways unconnected with their common meaning, such as APPLE computer or SHELL gasoline." *Id.* Fanciful marks are created out of whole cloth for the express purpose of serving to identify a product or service, e.g., KODAK or EXXON. *Id.* Both arbitrary and fanciful marks are "inherently distinctive" and therefore presumptively protectable without any further showing from the party seeking trademark protection. *Id.*

Suggestive marks "connote, without describing, some quality, ingredient, or characteristic of the product." *Sara Lee*, 81 F.3d at 464. Well-known examples of suggestive marks include Coppertone, Orange Crush and Playboy. *Id.* Like arbitrary and fanciful marks, suggestive marks are inherently distinctive and presumptively protectable. *Id.*

Descriptive marks "'merely describe a function, use, characteristic, size, or intended purpose of the product,' such as YELLOW PAGES telephone directories and 5 MINUTE glue." *OBX-Stock, Inc.*, 558 F.3d at 340  (quoting *Sara Lee*, 81 F.3d at 464).  Descriptive marks prove

protectable only where they acquire a "secondary meaning" in the minds of the relevant consuming public. *Pro-Concepts, LLC v. Resh*, 2013 WL 5741542, at *6 (E.D. Va. Oct. 22, 2013). A mark acquires secondary meaning "if 'a substantial number of present or prospective customers understand the [mark] when used in connection with a business to refer to a particular person or business enterprise.'" *Id.* (quoting *Perini*, 915 F.2d at 125).

Finally, generic marks are "'the common name of a product' or 'the genus of which the particular product is a species . . . .'" *OBX-Stock, Inc.*, 558 F.3d at 340. "Generic marks lie at the least-protected end of the spectrum of distinctiveness because such marks can never serve as valid service marks." *Zinner v. Olenych*, 108 F. Supp. 3d 369, 380 (E.D. Va. 2015) (Davis, C.J.).

Notably, marks that were once protectable as arbitrary, fanciful or suggestive may nonetheless become generic, and thus unprotectable, through the process of "genericide." *Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 821 (4th Cir. 2001). "Genericide occurs when the public appropriates a trademark and uses it as a generic name for particular types of goods or services irrespective of its source." *Elliott v. Google, Inc.*, 860 F.3d 1151, 1156 (9th Cir. 2017). Well-known victims of genericide include Thermos, Aspirin, Cellophane and Escalator. *Id.*; *Am. Online*, 243 F.3d at 821.

The question of where along the distinctiveness spectrum a given mark lies is a factual one, *Dayton Progress Corp. v. Lane Punch Corp.*, 917 F.2d 836, 839 (4th Cir. 1990), and the burden to demonstrate the distinctiveness, and thus validity, of an unregistered trademark rests on the party asserting ownership rights in the mark. *Shammas v. Rea*, 978 F. Supp. 2d 599, 606 (E.D. Va. 2013); *see also Am. Online*, 243 F.3d at 819 ("[Plaintiff] has not registered [its mark] with the PTO, and therefore it must carry the burden of establishing the validity . . . of the mark as part of its larger burden in a trademark infringement action."). To satisfy that burden, the

6

party asserting common law ownership rights must establish the mark's distinctiveness by a preponderance of the evidence. *Georgia Pac. Consumer Prod., LP v. Von Drehle Corp.*, 618 F.3d 441, 451 (4th Cir. 2010).

        With these legal concepts in mind, the Court turns to the origins of the case at hand.

## II.    BACKGROUND

        The procedural background of this case could fill a novella. For that reason, the Court recites only the history necessary to understand its decision on the parties' current motions. That stated, the salient procedural background transpired as follows.

        At issue in the instant trademark dispute are the United States rights to the MOKE mark, a mark with which both Plaintiff and Defendants[1] adorn their nearly identical products: low-speed, open-air vehicles known colloquially as "Mokes." Just shy of eight years ago, Defendants applied for registration of the MOKE mark with the USPTO. When the USPTO issued public notice of Defendants' application in late 2016, Plaintiff filed a notice of opposition to the pending registration. From there, opposition proceedings before the TTAB went on for the better part of three-and-a-half years, culminating in the TTAB's dismissal of Plaintiff's opposition in 2020. Plaintiff now appeals the TTAB's decision under § 1071(b) and asserts a Lanham Act claim against Defendants for trademark infringement. Defendants counterclaim with an infringement action of their own, while seeking this Court's affirmation of the TTAB decision

---

[1]     Defendants American Custom Golf Cars ("ACG"), Moke USA, LLC ("Moke USA") and Moke International, Limited ("Moke International") are related entities. In June 2019, ACG assigned its interest in the MOKE mark, including both its purported common law rights to the MOKE trademark as well as its interest in its pending trademark application for the same, to Moke USA. (Third Amended Counterclaims ("3d Am. Countercl.") (ECF No. 146) at 5–6.) Later, in April 2021, Moke USA assigned those same interests to Moke International. (*Id.* at 6–7.) For ease of understanding, the Court uses "Defendants" in this Opinion to refer to all three entities jointly, even where the actions attributed to all three were untaken by only one of the three entities.

below.  Given the ongoing appeal, Defendants' application for registration of the mark remains pending.

Though Defendants seek affirmation, and Plaintiff seeks reversal, of the TTAB's April 2020 opinion, the grounds on which the TTAB decided the opposition proceedings below prove largely irrelevant to deciding the parties' motions for judgment on partial findings.  As noted above, the parties to a § 1071(b) action may present new evidence before the district court, and here, the Court benefits from a far richer factual record than the TTAB possessed when it issued its decision.  Moreover, the parties' dispute now turns on an issue — trademark distinctiveness — that was neither raised nor decided in the proceedings below.  For these reasons, and because the Court reviews the record de novo, the Court largely steers clear of the TTAB's opinion.

Like the substance of the TTAB's opinion, the procedural history from the time that Plaintiff filed its Amended Complaint (July 2020) until the month of trial (January 2023) proves mostly unimportant to understanding the Court's decision.  The relevant points from this lengthy interval are strictly twofold.  First, the parties' cross-motions for summary judgment, which almost exclusively concerned causes of action no longer asserted by the time of trial, were denied in whole on account of genuine disputes of material fact.  (ECF No. 152.)  Second, and more importantly, neither the parties' motions for summary judgment nor any other pleadings filed during this two-and-a-half-year period mentioned the category of mark — fanciful, arbitrary, suggestive, descriptive or generic — into which the MOKE mark falls.  The relevance of this omission will become clear shortly.

The critical procedural action in this case occurred in the weeks immediately preceding trial. During this period, the events deserving mention are fourfold.  First, the parties agreed, via Joint Stipulation (ECF No. 238), to the voluntary dismissal of the bulk of their claims.  After the

8

parties' stipulation, both Plaintiff's complaint, which initially asserted nine causes of action, and

Defendants' counterclaims, which initially numbered seven, narrowed to three counts apiece.

Plaintiff's remaining claims included only its appeal of the TTAB decision (Count I), its

declaratory judgment action seeking a declaration of trademark ownership rights (Count II), and

its Lanham Act claim for trademark infringement (Count III).[2]  Similarly, Defendants' remaining

counterclaims included only their action for affirmation of the TTAB's decision (Count I), their

Lanham Act claim for trademark infringement (Count II), and their declaratory judgment action

for a declaration of non-infringement and trademark ownership (Count III).[3]

Second, the Court reacted to the parties' Joint Stipulation by directing the parties to brief

which, if any, of the remaining claims and counterclaims entitled them to a jury trial under the

Seventh Amendment.  (ECF No. 240.)  When the parties concurred that none of Plaintiff's

surviving claims or Defendants' surviving counterclaims entitled either party to a trial by jury

(ECF Nos. 241, 242), the Court struck the parties' jury demands and ordered that the case would

proceed as a bench trial (ECF No. 243).

Third, and returning to the parties' Joint Stipulation, the parties narrowly circumscribed

the factual and legal issues to be decided at trial.  Specifically, the parties mutually stipulated that

---

[2]     In the Joint Stipulation (ECF No. 238), Plaintiff represented that it would consolidate its Lanham Act claims (Counts III, IV and V of its Amended Complaint) into a single claim for trademark infringement.

[3]     The parties' Joint Stipulation (ECF No. 238) did not stipulate to the dismissal of Defendants' Lanham Act claim for false designation of origin (Count IV of the Third Amended Counterclaims).  During the final pretrial conference, however, Defendants consented to the voluntary dismissal of their false designation of origin claim (Count IV) based on Plaintiff's representation that it would permanently refrain from using photographs of Defendants' vehicles on its website.  The Court therefore dismissed Count IV of Defendants' Third Amended Counterclaims following the final pretrial conference.  (ECF No. 261.)

the other had established all but one of the elements required to prove their competing trademark infringement claims: ownership of a valid, protectable trademark.[4] Because Plaintiff's appeal of the TTAB decision and the parties' competing claims for declaratory relief also turn on trademark ownership, this stipulation effectively narrowed the entire case to a single issue — which party owns the MOKE trademark. Plaintiff made this understanding explicit in its pretrial brief, noting that "the parties agree that all of Plaintiff's claims, and all of Defendants' claims . . . depend on a single issue. That issue is who owns the MOKE trademark . . . ." (Pl.'s Pretrial Br. at 2.)[5]

The final relevant (non-)event from the period immediately preceding trial echoes an earlier point: in the weeks leading up to trial, and despite their mutual acknowledgement that trademark ownership constituted the suit's principal issue, neither party explicitly addressed the MOKE mark's categorization along the spectrum of distinctiveness. Thus, the parties left largely unmentioned a key aspect of their respective cases in chief: the validity, and thus protectability, of the MOKE mark. The only gesture at the MOKE mark's categorization from Plaintiff came in

---

[4]     In their Joint Stipulation, the parties agreed to the following:

> With respect to the parties' respective claims for trademark infringement, or non-infringement, of the MOKE mark . . . , Plaintiff and Defendants hereby stipulate and agree that the MOKE mark, as used by Plaintiff, on the one hand, and by Defendants, on the other hand, is used in commerce. Plaintiff further stipulates and agrees that Defendants have established the requisite likelihood of confusion with respect to their claims for trademark infringement, and Defendants further stipulate and agree that Plaintiff has established the requisite likelihood of confusion with respect to its claims for trademark infringement.

(ECF No. 238.) The thrust of the parties' legal stipulations was thus an understanding that the only disputed element of either party's trademark infringement claim was trademark ownership.

[5]     Defendants' Pretrial Brief indicated their agreement with Plaintiff's contention that deciding trademark ownership would prove dispositive in resolving the case, as Defendants deemed trademark ownership the suit's "central question." (Defs.' Pretrial Br. at 3.)

its pretrial brief, wherein Plaintiff baldly proclaimed, without hazarding an argument as to the mark's placement along the distinctiveness spectrum, that the MOKE mark is "inherently distinctive." (Pl.'s Pretrial Br. at 4.)[6]  In a similarly indirect fashion, the only suggestion at the mark's validity from Defendants' perspective came in their pretrial brief, wherein Defendants previewed an argument that they intended to flesh out at trial — namely, that Plaintiff's predecessor-in-interest to its purported trademark rights, Mini Mania, Inc., had employed the MOKE mark descriptively rather than "as a trademark." (Def.'s Pretrial Br. at 5.)  Still, like Plaintiff, Defendants proffered no argument or evidence as to the category of mark — fanciful, arbitrary, suggestive, descriptive or generic — to which the MOKE mark belongs.

Against the preceding backdrop, trial came to pass on January 27, 2023.  Sparing mention of arguments previously made but no longer relevant by the time of trial, the parties' contentions as to trademark ownership — again, an issue that the parties agreed would be dispositive to the entire suit — were as follows.  Plaintiff asserted common law trademark rights in the MOKE mark by virtue of a 2016 assignment agreement with non-party Mini Mania, Inc., an automotive parts reseller that began selling MOKE-branded parts in the 1970s.  In support of its common law rights, Plaintiff argued the following:

> Plaintiff asserts that it is the owner of the MOKE mark.  Although Plaintiff's own first sale under the MOKE mark took place after August 2015, [the date of Defendants' first sale of a vehicle bearing the MOKE mark,] Plaintiff has priority over the Defendants because Plaintiff acquired the MOKE trademark rights originally belonging to Mini Mania, Inc., a third party that has been using the MOKE mark in commerce in the United States well before . . . 2015 (indeed, since the 1970s).  As long as Mini Mania used the MOKE trademark in commerce

---

[6]      In deposition testimony submitted to the TTAB, Plaintiff's CEO, Todd Rome, testified to his understanding that the "word 'moke' is a 19th century British slang term for 'donkey,' a slow-moving animal which can be used to transport people or things." (ECF No. 284 at 11.)  Then, in Plaintiff's pretrial brief before the TTAB, Plaintiff referenced Rome's testimony in support of its contention that the MOKE mark is suggestive.  Plaintiff did not reiterate this argument before this Court in any pleading or brief.

> even one day before Defendant[s] . . ., and as long as Mini Mania assigned its
> rights to Plaintiff, Plaintiff has priority over Defendants and is the owner of the
> mark.

(Pl.'s Pretrial Br. at 5.)  Implicit in Plaintiff's argument, then, was its position that establishing

priority of use alone would prove tantamount to establishing ownership for purposes of the

parties' dispute.  The distinctiveness, and thus validity, of the MOKE mark was, in Plaintiff's

view, a foregone conclusion.

For their part, Defendants argued that their first sale of a vehicle bearing the MOKE mark

on August 10, 2015 — a priority date to which the parties twice stipulated[7] — bestowed an

unambiguous priority of use as against Plaintiff, an entity not formed until 2016.  In opposition

to Plaintiff's acquisition of Mini Mania's purported common law rights, Defendants asserted that

the record contained "no evidence" that "Mini Mania used the word 'Moke' to identify and

distinguish itself as the source of 'Moke' goods."  (Def.'s Pretrial Br. at 6.)  Rather, Mini Mania

had made "entirely descriptive and functional" use of the mark, deploying it to "describe [Mini

Mania's] products to consumers in a manner allowing the consumer to determine which of the

many vehicle parts sold by Mini Mania would work with a 'Moke' style vehicle." (*Id.*)  Because

such descriptive use "fails to constitute the type of use required" to establish common law

trademark rights, Defendants argued, Mini Mania never acquired trademark rights to the MOKE

mark.  (*Id.*)  And because Mini Mania lacked such rights, Defendants concluded, Plaintiff

received no common law rights from Mini Mania via the 2016 assignment, obliterating

---

[7]     The parties stipulated to Defendants' priority date on two occasions: once in their
Revised Joint Stipulation (ECF No. 254 at 1) and again in their Proposed Joint Final Pretrial
Order (ECF No. 258 at 2).  Notably, the parties' Joint Proposed Jury Instructions — which the
parties submitted before the Court's Order striking their jury demands — included an instruction
stating that "Defendant Moke International's priority date for the MOKE trademark is August
10, 2015." (ECF No. 214-2 at 35.)  Moke America did not object to the substance of this jury
instruction.

Plaintiff's claim to priority.

Trial began with Plaintiff's case-in-chief as to Mini Mania's purported common law trademark rights in the MOKE mark.  The evidence on this issue consisted of (1) testimony from Mini Mania's founder and longtime CEO and owner, Don Racine, (2) screenshots drawn from Mini Mania's website that show advertisements for its "Moke" products, (3) Mini Mania's sales records, and (4) copies of print advertisements that Mini Mania distributed in the late 1980s. After Plaintiff introduced the above evidence, counsel for Defendants cross-examined Don Racine.  At the close of cross-examination, Plaintiff rested its case; Defendants then orally moved for judgment on partial findings under Rule 52(c), arguing that Plaintiff had failed to demonstrate Mini Mania's common law trademark rights by a preponderance of the evidence, which necessitated a ruling against Plaintiff on trademark ownership.  And because the parties had stipulated that resolving ownership would in turn resolve the entire suit, Defendants argued, the Court could grant Defendants' motion with respect to all outstanding counts, entering judgment (1) against Plaintiff on its three outstanding claims and (2) for Defendants on their three outstanding counterclaims.

After hearing argument and considering the parties' positions, the Court credited Defendants' contention that Mini Mania had not used the MOKE mark to indicate the source or origin of its "Moke" products, but rather had employed the mark to indicate to potential customers that its wares were compatible with all Moke-style vehicles, irrespective of their origin.  In other words, the Court found as a matter of fact that Mini Mania had used the MOKE mark to describe the nature of its products, not to identify their provenance.  Because such use of the MOKE mark did not amount to trademark use, the Court further found that Mini Mania had not acquired common law trademark rights in the MOKE mark and, by extension, that Plaintiff

13

had failed to establish its priority of use. Based on Plaintiff's pretrial representations that a finding against it regarding priority of use would resolve all claims and counterclaims, the Court then granted Defendants' Rule 52(c) motion. Accordingly, the Court found against Plaintiff on Counts I, II and III of its Amended Complaint (ECF No. 20) and found in Defendants' favor on Counts I and III of its Third Amended Counterclaims (ECF No. 146).

The Court reserved judgment, however, on Count II of Defendants' counterclaims — their action for trademark infringement — based upon Plaintiff's last-minute argument in opposition to Defendants' Rule 52 motion. In the trial's waning moments, Plaintiff objected to a judgment for Defendants on their trademark infringement counterclaim, arguing that the Court's ruling on priority of use was not, as Plaintiff had previously stipulated it would be, dispositive of all of Defendants' claims. Plaintiff then raised the issue of the MOKE mark's distinctiveness for the first time.

In finding that Mini Mania lacked common law trademark rights, Plaintiff asserted, the Court had found not only that Mini Mania *used* the MOKE mark *descriptively*, but further, that the MOKE mark *was itself a descriptive trademark.* (Trial Transcript ("Tr.") (ECF No. 271) 108:19–110:21.) Because the validity, and thus ownership, of a descriptive mark turns on whether the mark possesses secondary meaning, Plaintiff continued, Defendants could not prevail on their trademark infringement counterclaim without first demonstrating that consumers associated the MOKE mark with Defendants' vehicles. (*Id.*) Simply put, if Defendants could defeat Mini Mania's purported trademark rights by arguing that the MOKE mark was descriptive, then Defendants could not reverse course as it concerned their own use of an identical mark. (*Id.*) Defendants were judicially estopped, said Plaintiff, from arguing that the MOKE mark is anything other than a descriptive mark, and Defendants would therefore need to

14

show secondary meaning before they could establish the MOKE mark's validity and, in turn, their own common law ownership rights.

Notwithstanding the Court's skepticism that Plaintiff could, at the eleventh hour, change its position as to whether resolving priority of use was dispositive to the entire case, the Court delayed issuing its findings of fact and conclusions of law and ordered supplemental briefing on the resolution of Defendants' trademark infringement counterclaim. (ECF No. 270.)  In their post-trial briefing, Defendants maintained that the Court's finding that Mini Mania lacked common law trademark rights, when considered alongside the parties' joint stipulation to Defendants' priority date, was sufficient to establish that Defendants owned the MOKE mark. (ECF No. 274 at 2–3.)  And if Defendants owned the MOKE mark, then Plaintiff was liable for trademark infringement, as the parties had already stipulated that each of them had established the other, non-ownership-related elements of their competing infringement claims.  (*Id.*)  Thus, Defendants argued, the Court should rule in Defendants' favor on their infringement counterclaim without further proceedings.  (*Id.*)  Notably, Defendants' post-trial briefing largely sidestepped the issue of the MOKE mark's distinctiveness, maintaining that Plaintiff's gesture towards the mark's distinctiveness category was a red herring — a mischaracterization of Defendants' arguments at trial.

For its part, Plaintiff used its post-trial brief to reiterate its position that Defendants were judicially estopped from abandoning the argument on which they prevailed at trial — namely, that the MOKE mark is a descriptive mark. (ECF No. 275 at 11–12.)  To demonstrate trademark ownership and prevail on their infringement counterclaim, Defendants needed to demonstrate secondary meaning. (*Id.* at 9–10.)  Plaintiff argued that the trial should therefore resume to consider the evidence, or lack thereof, of the MOKE mark's secondary meaning when used by

Defendants. (*Id.* at 3.)

Upon consideration of the parties' post-trial briefs, the Court agreed with Plaintiff's contention that Defendants' arguments at trial proved tantamount to taking the position that the MOKE mark is descriptive. And though the Court noted, in a status call with the parties, that there existed a "pretty compelling argument" that the MOKE mark is generic,[8] the Court further concurred with Plaintiff's assertion that in granting Defendants' Rule 52 motion, the Court had accepted Defendants' implied position as to the mark's typology. Thus, the Court clarified that inherent in its Order granting Defendant's Rule 52 motion (ECF No. 270) was its finding that the MOKE mark is descriptive, and the Court ordered that trial would resume to consider Defendants' evidence as to secondary meaning. The Court further ordered, however, that Defendants were to make their position as to the MOKE mark's typology — whether descriptive or otherwise — explicit in a second round of post-trial briefing.

The parties' second round of post-trial briefing quickly disposed with the need to resume trial, as Defendants stated in their opening brief (ECF No. 284) that they intended to present no further evidence as to secondary meaning or the MOKE mark's distinctiveness more broadly. Defendants instead argued that the Court needed no further evidence concerning distinctiveness, because the MOKE mark is arbitrary, i.e., inherently distinctive, and thus presumptively valid and protectable.[9] (*Id.* at 7–12.) Defendants then explained that they were not judicially estopped from arguing that the MOKE mark is inherently distinctive, as Plaintiff claimed, because Defendants never argued anything to the contrary. (*Id.* at 14–18.) Rather, they asserted at trial

---

[8]      Telephonic Status Conference Tr. (ECF No. 278) 4:21–23, Feb. 27, 2023.

[9]      Defendants later reaffirmed their desire to present no evidence on secondary meaning or the distinctiveness of the MOKE mark more broadly. (Rule 52 Motion Hearing Transcript ("Hr'g Tr.") (ECF No. 299) 3:14–18.)

that an inherently distinctive mark like MOKE may nonetheless be *used* descriptively, which is exactly what Mini Mania did when employing the MOKE mark on its websites and products. (*Id.* at 20–22.) Thus, Defendants argued, Mini Mania had failed to acquire trademark rights in the mark despite using the MOKE mark in commerce before Defendants. (*Id.*)

As a final flourish, Defendants then argued that it was Plaintiff, not Defendants, who was judicially estopped from submitting its current argument. (*Id.* at 19–20.) Plaintiff's re-characterization of Defendants' argument at trial, which contradicted Plaintiff's own position that the MOKE mark possessed inherent distinctiveness, was simply a post-hoc rationalization of a position meant to snatch Defendants' trial victory away at the last minute. (*Id.*)

Because Defendants felt no need to present additional evidence as to the MOKE mark's distinctiveness, the Court canceled the renewed trial dates that it previously set. And given that Defendants would present no evidence on secondary meaning, Plaintiff indicated that it now intended to file its own motion for judgment on partial findings as to Defendants' infringement counterclaim, arguing that Defendants, like Plaintiff, had failed to establish their common law rights to the MOKE mark. The Court therefore ordered a final round of briefing, this time on Plaintiff's Rule 52 motion. The Court then held oral argument on Plaintiff's motion in late April 2023.

The parties' Rule 52 briefs, as well as supplemental briefs addressing the import of recent Fourth Circuit caselaw,[10] now stand ripe for decision. And the MOKE mark's distinctiveness, or

---

[10] Three days after the Court issued its Memorandum Scheduling Order (ECF No. 277) establishing renewed trial dates, the Fourth Circuit issued a published opinion in *Interprofession du Gruyere v. U. S. Dairy Exp. Council*, 61 F.4th 407 (4th Cir. 2023). *Interprofession* dealt with a genericness challenge to the plaintiff cheese consortium's attempt to register the term GRUYERE as a certification mark with the USPTO. On appeal from the TTAB, both the district court, first, and the Fourth Circuit, second, concurred with the TTAB's finding that the

17

lack thereof, now stands as the central and dispositive issue in the case.[11]  The suit's posture, at

bottom, is the following:  If the MOKE mark proves inherently distinctive — i.e., fanciful,

arbitrary, or suggestive — then the Court's analysis of all six claims and counterclaims must

restart, beginning with an assessment of Mini Mania's purported common law rights to the mark.

If the MOKE mark proves descriptive, as the Court previously ruled, then the Court must assess

whether Defendants have established secondary meaning.  If not, then Defendants' claim of

trademark ownership proves equally flawed as Plaintiff's, and the Court must supplement its

post-trial Order by entering judgment against Defendants on their trademark infringement

counterclaim.  Finally, if the MOKE mark proves generic, then the same result follows as if it

were descriptive yet lacking in secondary meaning — neither party can claim common law rights

---

GRUYERE mark was a generic term for a type of cheese and thus unprotectable under the
Lanham Act.

   In light of the Court's preexisting reservations concerning the MOKE mark's validity —
evidenced by its earlier observation, during the post-trial status call, that one could make a
"compelling" argument that the mark is generic — and because the Fourth Circuit devoted
substantial analysis to the genericness issue in its opinion, the Court ordered supplemental
briefing on the effect of the *Interprofession* holding on the Court's examination of the MOKE
mark.  (ECF No. 282.)  The schedule for this briefing overlapped, by approximately nine days,
the briefing on Plaintiff's Rule 52 motion, and the Court now considers the parties'
*Interprofession* briefs alongside the parties' motion briefs and arguments at trial.

[11]   The Court's Order scheduling the parties' Rule 52 briefing instructed the parties to
identify where in their pretrial briefing (e.g., motions for summary judgment, motions in limine,
pretrial briefs) they identified the MOKE mark's categorization along the distinctiveness
spectrum.  Outside of the one instance, discussed on pages ten and eleven of this opinion, where
Plaintiff summarily declared that the MOKE mark is "inherently distinctive," the parties could
not identify any pretrial filing in which they spoke to the MOKE mark's distinctiveness, and thus
validity, as a mark.  This mutual failure to address the mark's validity before trial explains a
great deal of the post-trial procedural morass.

   In any event, the Court has now afforded both parties an opportunity to present evidence
on the mark's distinctiveness, and the Court has fielded an encyclopedic volume of argument
regarding the same.  Accordingly, the Court finds the issue sufficiently ripe for resolution.

to the mark, and the Court must enter judgment against Defendants on their trademark infringement cause of action. If the Court finds, contrary to its post-trial Order (ECF No. 270), that the mark correctly belongs to a category other than descriptive, then it must also revise that Order pursuant to Rule 54(b). Fed. R. Civ. P. 54(b); *see also Saint Annes Dev. Co. v. Trabich*, 443 F. App'x 829, 832 (4th Cir. 2011) ("The power to reconsider or modify interlocutory rulings is committed to the discretion of the district court, and that discretion is not cabined by the heightened standards for reconsideration governing final orders.") (cleaned up).

What follows are the Court's findings of fact and conclusions of law, pursuant to Rule 52(a) and (c), as it concerns all claims and counterclaims in this action.

## III.    ANALYSIS

### A.    Standard of Review

"Under Rule 52(c), the Court may grant Judgment on Partial Findings if [1] a party has been fully heard on an issue, [2] the Court finds against the party on the issue, and [3] a favorable ruling on the issue is necessary for a judgment in the party's favor." *Aluker v. Yan*, 2021 WL 972885, at *2 (E.D. Va. Mar. 4, 2021). When the Court grants judgment on partial findings, it must support its determination by specific findings of fact and conclusions of law. Fed. R. Civ. P. 52(c). And where, as here, a party appeals a decision of the Trademark Trial and Appeal Board pursuant to 15 U.S.C. § 1071(b), "the district court reviews the record de novo and acts as the finder of fact" in the first instance. *Swatch AG*, 739 F.3d at 155. The Court enjoys "authority independent of the PTO to grant or cancel registrations and to decide any related matters such as infringement and unfair competition claims." *Id.*

Before proceeding, the Court again notes that to prevail in a trademark infringement claim under Section 43(a) of the Lanham Act, a plaintiff must show that (1) it owns a valid,

protectable trademark and that (2) "the defendant's use of a colorable imitation of the trademark is likely to cause confusion among customers." *Pro-Concepts*, 2013 WL 5741542, at *5. The parties mutually stipulated to customer confusion, and the only disputed element is therefore ownership of a valid, protectable mark. Because neither party possesses a federal registration of the MOKE mark, each bears the burden of establishing its ownership of the mark, including the mark's validity (i.e., distinctiveness), by a preponderance of the evidence. *Am. Online*, 243 F.3d at 819; *Georgia Pac.*, 618 F.3d at 451. Both parties have failed to meet their burden here.

### B.   Findings of Fact

Based on the evidence presented at trial, the parties' stipulations, the parties' publicly available websites,[12] and the factual record before the TTAB,[13] the Court makes the following findings of fact.

#### *Moke Origins*

1.   In the early 1960s, the now-defunct British Motor Corporation ("BMC") introduced a vehicle known as the "Mini Moke" into the British car market. (Pl.'s Ex. 17.)

2.   The BMC Mini Moke — colloquially, the "Moke" — is an open-air, lightweight vehicle that sits low to the ground. BMC marketed the Moke, which the company initially designed for military purposes, as a low-cost utility vehicle. (Pl.'s Ex. 17.)

---

[12]   Given their probative value in resolving the issues at hand, the Court takes judicial notice of the contents of both parties' websites. *Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227 (4th Cir. 2013) ("A court may take judicial notice of information publicly announced on a party's website, so long as the website's authenticity is not in dispute and it is capable of accurate and ready determination.") (cleaned up).

[13]   The Court draws on facts established in the proceedings before the TTAB via the TTAB's April 2020 Opinion (ECF No. 1-6) and the USPTO's Trademark Status and Document Retrieval System ("TSDR"). *See* USPTO, TSDR, Case ID 76718389, *Documents*, http://tsdr.uspto.gov. "Materials in the online files of the USPTO and other matters of public record are proper subjects of judicial notice." *Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 145 (N.D. Cal., 2020) (citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006)).



(An early Moke, as shown on Mini Mania's website in 2008.)

3.    From the Moke's introduction in the 1960s until 1993, BMC and several other manufacturers produced Mokes in at least three countries — the United Kingdom, Australia, and Portugal. Mokes changed in name and style over time, with variations on the original known as the "Austin Mini Moke," the "Morris Mini Moke," the "Leyland Moke," and the "Moke Californian." Irrespective of their style, name, manufacturer or country of origin, however, all variations were and are referred to colloquially as "Mokes." BMC and its apparent progeny produced approximately 50,000 Mokes before production ceased in 1993. (Pl.'s Ex. 17); (Tr. 27:8–28:8.)

4.    Notwithstanding their limited production, Mokes garnered a small but devoted following for use as a beach buggy in the United States, the Caribbean and Australia. (Pl.'s Ex. 17.) A meaningful secondary market for Mokes developed in the United States at least as early as 1988. (Pl.'s Ex. 34.)

   *Mini Mania*

5.    In or around 1974, Don Racine, an enthusiast of the MINI Cooper brand cars produced by BMC and its corporate successors, founded a California corporation by the name of Mini Mania, Inc. (Tr. 19:7–20:4.) Don Racine owned and solely operated Mini Mania from its founding through its 2016 assignment agreement with Plaintiff. Though he sold Mini Mania to a third party in 2019, Mini Mania still employs Racine on a part-time basis today. (Tr. 20:22–21:5.)

6.    From its founding until 2016 — the relevant period for the Court's purposes here — Mini Mania conducted business as an automotive parts reseller, specializing in replacement parts for small, English vehicles, e.g., Mini Coopers and Austin Healey Sprites. (Tr. 21:14–22:1.) At least as early as 1989, Mini Mania began selling replacement parts for Mokes. (Tr. 22:2–3; 24:13–18.)

7.    Don Racine characterized Moke as a style of vehicle, encompassing several varieties of "Mokes" manufactured across space and time. (Tr. 25:12–28:8; 43:25–45:18.) Specifically, Racine testified to his understanding that after BMC ended production of the original Mini Moke in the United Kingdom, no fewer than three companies later took up production of a "Moke" vehicle. (Tr. 26:3–28:11; 37:14–24.) Two of these companies — one in Australia and one in Portugal — may have, in Racine's understanding, been corporate offspring of BMC. (Tr. 25:12–28:8.) The third company — a Moke producer in China — manufactured a Moke well into the twenty-first century. (Tr. 37:14–24.)

8.    Irrespective of their relationship with BMC and the original Mini Moke, Racine testified, these later companies each produced Mokes that exhibited unique stylistic features not found on either the original Mini Moke or the other companies' Mokes. (Tr. 25:12–28:8; 43:25–45:18.) Notwithstanding any stylistic differences, however, Racine referred to all of the vehicles produced by these later companies as "Mokes."

9.    Mini Mania sourced the Moke parts that it resold from numerous foreign suppliers (Tr. 44:4–11.) Racine testified that Mini Mania accessed parts from between ten and twenty distinct suppliers during his tenure as owner and CEO. (Tr. 44:4–11.)

10.    In its early years, Mini Mania advertised its products, including Moke replacement parts, through monthly flyers and newsletters. (Tr. 23:2–10) (Pl.'s Ex. 34.) In or around 1996, however, Mini Mania began selling Moke parts over the internet, via MiniMania.com (Tr. 35:9–25.) Approximately twelve years later, Mini Mania created a website dedicated to advertising its Moke replacement parts — MiniMokeUSA.com. (Tr. 46:4–48:16.)

11.    Mini Mania displayed the MOKE name prominently on MiniMokeUSA.com. "MOKE" appeared in all-caps at the top of the site's homepage and various subpages. (Pl.'s Exs. 12, 14, 15, 16.) The website included a "Moke History" subpage, which contained a brief retelling of the vehicle's origins. (Pl.'s Ex. 17.)

12.    Via MiniMokeUSA.com, customers could browse, but not purchase, Mini Mania's available Moke replacement parts. (Tr. 70:16–18.) When a customer found a product he wished to purchase on MiniMokeUSA.com, an associated hyperlink on the product's subpage would then redirect the customer to MiniMania.com, where he would complete the purchase process. (Tr. 70:6–71:3.) Mini Mania sold replacement Moke parts by this method to customers nationwide. (Tr. 23:14–20.)

13.    Mini Mania held out most of its replacement Moke parts as compatible with all Mokes, irrespective of their vintage or country of origin. (Pl.'s Exs. 12, 34.) Mini Mania did not, however, manufacture any of the Moke parts that it sold. And despite holding itself out as the "official distributor" of Moke parts in the United States by virtue of an "exclusive contract with the manufacturer," Don Racine testified that Mini Mania never executed a distributorship agreement with any third-party manufacturer. (Tr. 56:7–58:21.)

14.    Mini Mania also advertised a "Californian Mini Moke DIY Build Kit" (the "Moke Kit") for sale through MiniMokeUSA.com. (Pl.'s Exs. 14, 15, 41.) The Moke Kit was a collection of multiple parts from which a customer could assemble their own Moke, provided that the customer sourced the "subframes, suspension, engine, and transmission" themself from a "donor Mini." (Tr. 39:10–40:15.) And again, though Mini Mania held itself out as the "official distributor" of such kits, Don Racine conceded that this representation was a lie. Indeed, Racine conceded that any individual in the United States could have, in theory, obtained an identical kit directly from the same Chinese manufacturer from whom Mini Mania purchased the kit. (Tr. 73:23–74:9.)

15.    None of the Moke replacement parts that Mini Mania sold came with a warranty from their manufacturer. Mini Mania would, however, supply a twelve-month, 12,000-mile

warranty on all parts that it sold.  (Tr. 31:3–13.)

16.     Mini Mania never registered with the California Department of Motor Vehicles, and it
        never sold a fully assembled vehicle complete with an associated VIN number.  (Tr.
        40:1–41:2.)  Mini Mania never applied for registration of the term MOKE with the
        USPTO.  (Tr. 51:22–25.)

17.     Racine stated that Mini Mania's intent in establishing the MiniMokeUSA.com website
        was to appeal to Moke enthusiasts and "become the Moke people in the U.S."  (Tr.
        76:23–77:24.)

        ***Plaintiff's Assignment Agreement with Mini Mania***

18.     In November 2016, entrepreneur Todd Rome formed a Delaware LLC named Moke
        America ("Moke America Delaware").  Shortly after its formation, Moke America
        Delaware executed a "License and Assignment Agreement" (ECF No. 1-2) with Mini
        Mania whereby Mini Mania purported to assign its common law trademark rights in the
        MOKE trademark to Moke America Delaware.

19.     A few days later, Todd Rome formed a second Moke America entity in the state of New
        York.  This entity, also named Moke America LLC, is Plaintiff in the instant action.

20.     Still later in November 2016, by operation of a 2022 *nunc pro tunc* agreement, Moke
        America Delaware executed an assignment agreement with Plaintiff that purported to
        assign the common law trademark rights that Moke America Delaware had received from
        Mini Mania to Plaintiff.  (ECF No. 120-3.)

        ***Plaintiff's Mokes***

21.     Since 2016, Plaintiff has consistently sold fully-assembled vehicles bearing the MOKE
        logo to individuals and distributors across the United States.  To the untrained eye, these
        vehicles appear largely indistinguishable from the twentieth-century Mokes that BMC
        and its apparent corporate successors sold.



(Plaintiff's Moke, as pictured on its website, www.mokeamerica.com.)

22.     Plaintiff's "About Us" page on its website states, in part, the following:

23

Created by the British Motor Company and Alec Issigonis, the father of the original Austin Mini, the Moke was designed to be combat ready, a car that could be parachuted from the skies.  While its life as a military vehicle didn't last too long, the open-air car became beloved by stars, surfers and Caribbean travelers.  Moke became synonymous with easy breezy island chic.

At Moke America, we have reengineered the entire car, while keeping Moke's classic design and spirit alive.  We made the car bigger, wider and stronger.  Our car is 2,300 pounds.  It's the heaviest Moke ever built.  It feels sturdier than the old Mokes . . . .

Most importantly, we wanted the Moke to be green . . . . The old Mokes had engines that were very noisy.  With ours, it's silent when you drive. You can charge it with a 110-outlet.  It plugs into any household outlet. Eight hours gets a full charge, and a full charge can get you almost forty miles of drive time.

### *Defendants' Mokes*

23.  Defendants first sold a vehicle bearing the word MOKE in the United States on August 10, 2015.  (ECF No. 254 at 1.)

24.  Like Plaintiff's Mokes, Defendants' Mokes appear largely indistinguishable from the twentieth-century Mokes pictured on Mini Mania's website.



(Defendants' Mokes, as pictured on www.mokeinternational.com.)

25.  In addition to its own recapitulation of the Moke's twentieth-century history, Defendants' website (www.mokeusa.com) states, in part, the following:

Moke International is bringing back this iconic car.  Internationally recognized British designer Michael Young has completely redesigned and re-engineered the Moke for the 21st Century.  While the new, much anticipated model remains faithful to its origins and classic look, it also integrates the most pertinent elements of today's automotive technology for a new generation of drivers.

24

C.     **Conclusions of Law**

With the benefit of the preceding factual findings, the Court now turns to consider the

mixed question of law and fact at the heart of this case — where along the distinctiveness

spectrum the MOKE mark lies and whether, based on that factual finding, either party can claim

ownership rights in MOKE as a valid, protectable mark.  Because the Court finds, both as a

matter of fact and as a matter of law, that MOKE amounts to nothing more than a generic term

for a type or style of vehicle, the Court answers the second half of that inquiry in the negative.  *In*

*re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 828 F.2d 1567, 1569 (Fed. Cir. 1987) ("Generic

terms . . . are the antithesis of trademarks, and can never attain trademark status.").

### *In a Vacuum, the MOKE Mark May Appear Inherently Distinctive*

At first blush, the MOKE mark might appear fanciful, arbitrary, or suggestive; the Court

can easily construct a plausible argument in support of each categorization.  In American

English, "moke" lacks any defined meaning.  If the analysis ends there, MOKE amounts to a

fanciful mark — a contrived word that exists exclusively for use as a trademark.  *OBX-Stock*,

558 F.3d at 340.  And Plaintiff indeed plants its flag on the fanciful hill, arguing that MOKE

"has no meaning and no connection to automotive products other than being a trademark,

analogous to the trademarks EXXON and KODAK."  (ECF No. 285 at 12.)

Expand the etymological inquiry only slightly, however, and "Moke" becomes arbitrary.

In British English, "moke" is a slang term for a donkey or mule.  *Moke*, MERRIAM-

WEBSTER.COM, https://www.merriam-webster.com/dictionary/moke (last visited April 14, 2023).

Accept this meaning, apply it to automobiles, and — *voila!* — MOKE becomes a "common

word[] applied in [an] unfamiliar way," i.e., an arbitrary mark.  *U.S. Search, LLC v. U.S.*

*Search.com Inc.*, 300 F.3d 517, 523 (4th Cir. 2002).  For their part, Defendants stake out their

claim here, arguing that "applying [MOKE] to Defendants' vehicles is not intuitive . . . [g]iven its definition, the word 'moke' is arbitrary when applied to . . . vehicle products." (ECF No. 284 at 13.)

Pause to contemplate British slang a few moments longer, however, and the analysis shifts yet again. If the Court takes judicial notice of the widely-held perception that mules are slow-moving, obstinate pack animals,[14] then MOKE suddenly becomes a suggestive mark. MOKE "connotes, without describing, some quality . . . or characteristic of the product," *OBX-Stock*, 558 F.3d at 340, namely, that a MOKE vehicle carries people and things at a leisurely pace, perhaps with a little attitude.

### *However, Context Matters*

In a vacuum, the Court would be inclined to agree with one or more of the preceding analyses. However, trademarks operate in a commercial context that transcends the products that they adorn. *Id.* at 339. A mark proves distinctive not strictly by virtue of its relationship with the markholder's product, but also by virtue of its capacity to denote the source or origin of that product to the consuming public. *Id.* And where a mark lacks this source-identifying capacity, it is not a distinctive, protectable mark at all. *Id.* at 339–40 ("[M]arks enable consumers to make informed, independent decisions about quality and other product characteristics. But the law . . . den[ies] mark holders an exclusive interest in words that do not identify goodwill attached to products . . . ."); 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 3:1 (5th ed. 2023) (a mark does not function as a trademark unless it "identif[ies] and distinguish[es]

---

[14]    If the well-known idiom, "stubborn as a mule," leaves the reader wanting, consider Flannery O'Connor: "Nobody wants his mule and wagon stalled on the same track the Dixie Limited is roaring down." Flannery O'Connor, *Some Aspects of the Grotesque in Southern Fiction*, in MYSTERY AND MANNERS 36, 45 (Sally and Robert Fitzgerald, eds., 1969).

the seller's goods from goods made or sold by others"). Indeed, as the Fourth Circuit deftly summarized in *America Online v. AT&T*:

> At bottom, the law of trademarks intends to protect the goodwill represented by marks and the valid property interests of entrepreneurs in that goodwill against those who would appropriate it for their own use. But it likewise protects for public use those commonly used words and phrases that the public has adopted, denying to any one competitor a right to corner those words and phrases by expropriating them from the public linguistic commons. Enforcing these conflicting policies creates line-drawing problems that are not always easily solved.

243 F.3d at 821 (cleaned up).

In this case, the commercial context surrounding the parties' use of the MOKE mark informs the Court's finding that the MOKE mark is not fanciful, arbitrary or suggestive. Rather, the existence of nearly identical products bearing the same mark and referred to by the same name — products that the parties themselves explicitly reference when marketing their own vehicles — leads the Court to a finding that the MOKE mark proves generic when used in connection with the parties' "Mokes." Recognizing that trademark categorizations are often a close call, the Court grounds this genericness finding in the considerations that follow.

### *The Parties Deploy the MOKE Mark for Non-Trademark Purposes*

First, consider the purpose underlying the parties' use of the MOKE mark, beginning with Plaintiff's purported predecessor-in-interest, Mini Mania. *McCarthy*, *supra* at § 3:1 ("The requirements for qualification of a word . . . as a trademark can be broken down into three elements . . . (3) *the purpose*: to identify and distinguish the seller's goods from goods made or sold by others."). Mini Mania, from whom Plaintiff claims it acquired common law trademark rights, employed the MOKE mark in a manner that *explicitly acknowledged* and *commercially exploited* consumers' association of the MOKE mark with sources other than Mini Mania. Put

differently, Mini Mania's business model was premised on its customers' ability to associate the MOKE mark with BMC and its ostensible corporate successors, rather than Mini Mania itself.

By 1988, a sufficient quantity of BMC's Mokes had made their way to the United States to allow for a secondary market in the vehicles to take hold. (Pl.'s Ex. 34.)  Mini Mania itself facilitated and participated in this market.  (*Id.*)  Cognizant of the quantity of Mokes in circulation stateside, Moke enthusiast Don Racine began sourcing Moke parts abroad and reselling them to Moke owners in the United States.  (Tr. 44:14–19.)  Mini Mania pitched these products, by and large, as compatible with all Mokes, irrespective of their source, style or vintage.  (Pl.'s Ex. 12, 34.)

Mini Mania plastered the MOKE mark across the top of its website, incorporated "Moke" into the name of many of its products, and described many of its products as compatible with "all Mokes."  (Pl.'s Ex. 12, 34.)  Through these efforts, Mini Mania sought to capitalize on an association in its customers' minds between the MOKE mark and the "Mokes" produced by BMC and its progeny.  Implicit, and at times explicit, in Mini Mania's use of the MOKE mark was a recognition that searching for the MOKE mark on a vehicle or part would not invariably lead a customer to buying a Mini Mania product. *Cf. Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 907 (9th Cir. 1995) (finding challenged mark invalid where consumers who strictly looked for the mark on a product "could . . . buy a product that is neither authentic nor made by [the putative markholder]").  Quite the opposite, Don Racine knew that his target customers were aware of or owned Mokes that did not originate with Mini Mania, and that those customers would buy Mini Mania's replacement parts precisely because they associated the MOKE mark with *those* products — again, products that Mini Mania did not produce.

Mini Mania's business model thus incorporated the MOKE mark not to indicate the source or origin of Mini Mania's products, but to reference the Mokes that its target customers already owned. By employing the MOKE mark in this manner, Mini Mania did not use it as a trademark, but instead as a generic term, synonymous with a style of vehicle produced by different companies in a prior era. *Perini*, 915 F.2d at 124 ("Eligibility for protection depends upon the market's association between the particular mark and the goods or the business [of its user].").

Moving to the parties themselves, both Plaintiff and Defendants mimic Mini Mania's non-trademark usage when employing the MOKE mark in their own businesses. Far from seeking to identify themselves as the exclusive source or origin of products bearing the MOKE mark, both parties instead make explicit efforts to associate their Mokes, and the MOKE mark, with the Mokes produced by BMC and its apparent corporate successors — vehicles that both parties acknowledge they did not produce. The parties pitch their vehicles as renewed takes on this classic style — updated versions of an iconic product that existed and thrived long before their companies were born. This marketing tactic appears readily on the parties' websites.

On MokeAmerica.com, for example, Plaintiff briefly retells "Moke's History," observing that the Moke, which was "[c]reated by the British Motor Company," "began as a military invention for the British army in the late 1950s [and] became a cultural touch point" in later years.[15] Plaintiff continues by stating that it has "reengineered the entire car, while keeping Moke's classic design and spirit alive." Plaintiff then contrasts its Moke with "the old Mokes," noting that its vehicle is "the heaviest Moke ever built," and thus "sturdier than the old Mokes."

---

[15]     MOKE AMERICA, *About Us*, https://mokeamerica.com/pages/about-moke-america (last visited April 19, 2023).

Put it all together, Moke America states, and its vehicle is "[a] 20th-century collectible car reinvented."

The same usage shines through on one of Defendants' websites, MokeUSA.com.  There, Defendants retell the same history before stating that "Moke International is bringing back this iconic car."[16]  Defendants then go on to state that they have "completely redesigned and re-engineered the Moke for the 21st Century . . . remain[ing] faithful to its origins and classic look."

Both parties' websites thus evidence their efforts to imbue the MOKE mark with significance and meaning beyond identifying their products alone.  Plaintiff and Defendants both want customers to know that they are taking up the mantle of a twentieth-century product of the same name.  And by employing the MOKE mark in conjunction with the twentieth-century history of BMC's Mokes, the parties draw on an association between the mark and another company's products, seeking to exploit that association to sell their own vehicles.  In that effort, the parties implicitly disclaim that the MOKE mark identifies their products and their products alone.  Rather, to hear the parties tell it, the twentieth-century Mokes, many of which are still in circulation in the United States, are so iconic that MOKE has become synonymous with a style of vehicle — a style mimicking the "Mokes" produced by BMC and its corporate successors.  For Plaintiff and Defendants, then, their products are merely a species within the MOKE genus, a song within the MOKE genre.  *OBX-Stock*, 558 F.3d at 340 ("Generic words . . . are the genus of which the particular product is a species . . . .") (cleaned up).  The MOKE mark thus serves not as an indication of source, but as a talisman of a particular style.  This is quintessential genericism.  *Cf. Nestle Co. v. Chester's Mkt., Inc.*, 571 F. Supp. 763, 769 (D. Conn. 1983),

---

[16]     MOKE USA, *Learn Our History*, https://mokeusa.com/history/ (last visited April 19, 2023).

*vacated due to settlement*, 609 F. Supp. 588 (D. Conn. 1985) (finding the "Toll House" mark generic where competing cookie manufacturers used the mark, which originated with the Toll House Inn in Whitman, Massachusetts, as a stand-in for a type of cookie — namely, a chocolate chip cookie made with the Toll House recipe).

### *The Policy Rationales Underlying Trademark Protections Do Not Support Affording Trademark Protection to the MOKE Mark*

Consider next the dual policy rationales undergirding trademark law:  (1) protecting consumers against fakes and counterfeiters and (2) safeguarding markholders' investments of time and money in building the goodwill associated with their mark.  *See George & Co.*, 575 F.3d at 392–93 ("[A] trademark not only 'protects the goodwill represented by particular marks,' but also allows 'consumers readily to recognize products and their source,' preventing 'consumer confusion between products and between sources of products.'") (quoting *OBX-Stock*, 558 F.3d at 339).  Here, reserving the MOKE mark for one of the parties and excluding all others, including third parties, from employing the mark in connection with motor vehicles would not serve either purpose.

Taking the policy rationales in reverse order, the Court first observes that the facts in the record evidencing consumer goodwill associated with the MOKE mark largely suggest that consumers direct such goodwill towards the Moke vehicles manufactured in the twentieth century by BMC and others, not the vehicles produced by either Plaintiff or Defendants.  Outside of their mutual stipulation that consumers are confused by the presence of both their products in the marketplace, neither Plaintiff nor Defendants put forth <u>any</u> evidence that consumers associate MOKE with their particular products.  The parties offered no consumer surveys, no customer testimonials, and no news stories or trade journals evidencing an association between the MOKE mark and their vehicles.  On the other side of the ledger, by comparison, Don Racine's testimony

31

— wherein he acknowledged that Moke "enthusiasts" existed long before any party to this suit
— and the longevity of Mini Mania's business reselling MOKE-compatible parts indicate that
consumers in the American market understood and continue to understand MOKE as a style
reminiscent of the twentieth century Mokes.  Furthermore, and as noted immediately above, the
parties' references to the twentieth century Mokes on their websites lay bare their shared
understanding that by employing the MOKE mark in connection with their vehicles, the
companies are merely capitalizing on consumer goodwill that already exists, not goodwill that
they themselves have built.  In brief, neither Plaintiff nor Defendants can plausibly maintain that
it is *their* investments of time and money that imbue MOKE with a "cult" following and thus
warrant the exclusionary benefits accompanying trademark status. *See Visa, U.S.A., Inc. v.
Birmingham Tr. Nat. Bank*, 696 F.2d 1371, 1375 (Fed. Cir. 1982) ("[Trademarks] are integral
and inseparable elements of the goodwill *of the business or services to which they pertain*.")
(emphasis added).

As to protecting consumers against fakes and counterfeiters, the Court finds that this
policy rationale would be equally disserved by reserving the MOKE mark for one party over the
other.  The evidence presented to the Court contains no allegation or intimation that either party
is a corporate relative of the British Motor Corporation.  Thus, neither Plaintiff nor Defendants
can maintain that they manufacture the "One True MOKE."  And while the vehicles that the
parties produce are, for all intents and purposes, indistinguishable, this is by design, as both
explicitly note that their vehicles mimic the design of the "iconic" MOKE of yesteryear.  To state
that one party is producing a fake or counterfeit MOKE would be equally damning to the other,
as both Plaintiff and Defendants clearly market their Mokes as imitations of a pre-existing
product sharing the same name.  If anything, granting trademark protection to either Plaintiff or

Defendants would itself give rise to customer confusion, as it would incorrectly signal to consumers that the trademark holder serves as the exclusive source of Mokes, despite that party's acknowledgement that bona fide Mokes manufactured by other companies — British, Australian, Portuguese, or otherwise — remain in the marketplace. [17] In sum, the Court finds that bestowing trademark status on the MOKE mark would disserve the policy rationales undergirding trademark protections, irrespective of which party ultimately won the mark.

### *The Parties' Distinctiveness Arguments Prove Unavailing*

Beyond the aforementioned considerations, the Court further finds that the parties' arguments in support of the MOKE mark's distinctiveness prove unavailing. The Court

---

[17] To further underscore this point, consider the effect that granting trademark protection to either side would have on third parties not present in this suit. If the Court granted trademark rights for the MOKE mark, all other entities claiming to manufacture or sell vehicles emulating the MOKE style, whether party to this suit or not, would lose the ability to describe their products with the most accurate and precise term available. "Moke" would vanish from the "linguistic commons," *Am. Online*, 243 F.3d at 821, and remain available for use by only a single entity — either Plaintiff or Defendants.

Ordinarily, the policies underlying intellectual property protections would endorse such a result, as this de facto monopoly would protect the markholder's investment of time, effort and money against "those who would appropriate [that effort] for their own use." *Id.* But where neither side can rightfully claim to have invested the time, effort and money that attracted consumer goodwill to MOKE in the first instance, as the Court finds to be true here, this policy rationale proves moot.

Instead, the relevant policy consideration in this case focuses on the breadth and wellbeing of the public lexicon, because while trademark law indeed protects entrepreneurial goodwill, "it likewise protects for public use those commonly used words and phrases that the public has adopted, denying to any one competitor a right to corner those words and phrases by expropriating them from the public 'linguistic commons.'" *Id.* Here, the parties fail to show that their right to use the MOKE mark should prevail over that of third parties and at the expense of the public vocabulary, especially where neither side can credibly demonstrate that its expenditures and efforts are responsible for any consumer goodwill associated with the mark. *See Kellogg*, 305 U.S. at 122 ("Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all — and in the free exercise of which the consuming public is deeply interested.").

discusses each in turn.

First, Plaintiff and Defendants spill a great deal of ink discussing the supposed dearth of evidence in the record demonstrating the MOKE mark's genericness. On this point, both parties cite the Fourth Circuit's decisions in *Glover v. Ampak, Inc.*, 74 F.3d 57 (4th Cir. 1996) and *Interprofession du Gruyere v. U. S. Dairy Exp. Council*, 61 F.4th 407 (4th Cir. 2023) for the proposition that purchaser testimony and consumer surveys are *de rigueur* in cases denying trademark protection on genericness grounds. (ECF No. 289 at 4–5; ECF No. 285 at 7–10.) Without such evidence, the parties argue, the Court cannot find that the "primary significance" of the MOKE mark in the minds of relevant consumers is its indication of type or style, rather than source — a finding the Court must make to deem the mark generic and deny judgment in their respective favors on their competing infringement claims.

These arguments prove fundamentally flawed, however, in that the parties confuse who bears the burden of proof in the instant proceedings. And a brief glance at the cases to which the parties cite reveals that neither controls the evidentiary burden that the Court must apply here.

In *Glover*, the Fourth Circuit confronted the defendant knife manufacturer's genericness argument in the setting of the manufacturer's counterclaim for cancellation of the plaintiff's *already-registered* mark. 74 F.3d at 59. Because the plaintiff's certificate of registration entitled it to the "presumption that [its] mark is valid," the court explained, the defendant manufacturer faced "the burden of proving [genericness] by a preponderance of the evidence." *Id.* In light of that burden, the court would go on to hold, the defendant's failure to "perform any consumer surveys" or proffer any testimony of "the public's understanding" of the challenged marks proved crippling to its genericness challenge. *Id.* at 60.

In *Interprofession*, by contrast, the Fourth Circuit faced a genericness challenge to an

*unregistered* mark. 61 F.4th at 414. There, the defendant American cheesemaking companies opposed the plaintiff's attempt to register a certification mark for gruyere cheese with the USPTO, arguing that the GRUYERE mark was generic for a mere type of cheese and, thus, unprotectable. *Id.* Notwithstanding that the GRUYERE mark was unregistered at the time of the suit, however, the defendant/opposer still bore the burden to prove genericness by a preponderance of the evidence. *Id.* at 416. And the court again looked to the absence of consumer survey evidence as an important — though notably, not dispositive — consideration in making its distinctiveness finding. *Id.* at 425–26.

The posture of the parties' current dispute proves readily distinguishable from both *Glover* and *Interprofession.* Here, unlike *Glover*, neither party boasts a registration of the MOKE mark; thus, neither party enjoys a presumption that their mark is valid. *Reese Pub. Co. v. Hampton Int'l Commc'ns, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980) ("[W]here, as here, the mark is not registered, [the] presumption of validity does not come into play. Instead, the burden is on plaintiff to prove that its mark is a valid trademark."). That the MOKE mark remains unregistered, however, does not render the instant suit cleanly analogous to *Interprofession* either, because unlike the plaintiff in *Interprofession*, who avoided shouldering the genericness burden despite asserting rights in an unregistered mark, the parties to this suit assert more than a mere claim for trademark registration. Rather, both parties assert affirmative claims for trademark infringement, a cause of action requiring that each prove its ownership of a valid, protectable mark by a preponderance of the evidence. *Shammas*, 978 F. Supp. at 606 (noting, in suit for trademark infringement, that "plaintiff's evidence must be sufficient to establish . . . that the proffered mark is protectable").

35

If either party held a registration, or if either party merely *sought* registration, then the
genericness burden would fall as it did in *Glover* and *Interprofession* — on the party opposing
the holder or seeker of registration. *Reese*, 620 F.2d at 11. However, because the MOKE mark
remains unregistered, and because both parties bear the burden of proof in their respective
infringement claims, neither the Court nor the opposing party shoulders a burden to prove that
the MOKE mark is generic and thus *unprotectable*. Instead, the burden rests with the parties,
both of whom assert common law trademark rights and infringement thereof, to prove that the
mark is *protectable*. *Id.* On that score, each party faces its own burden to show that the
"primary significance of the term in the minds of the consuming public is not the product, but the
producer." *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 113 (1938).

The Second Circuit confronted an analogous posture in *Reese*. 620 F.2d at 11. There, the
infringement plaintiff, unsuccessful below, claimed that the district court erred by burdening it
with the obligation to prove the non-genericness of its unregistered mark. *Id.* The Second
Circuit panel rejected this line of argument, stating the following:

> Appellant [contends] that there is no basis in the record for the lower court's
> conclusion that appellant's mark was generic. According to appellant, the
> defendants in this trademark infringement action had, but failed to carry, the
> burden of proving that appellant's title was generic. We disagree. If a mark has
> been registered with the [USPTO], the defendants in an infringement action do
> bear the burden of overcoming the presumption that the mark is not generic. But
> where, as here, the mark is not registered, this presumption of validity does not
> come into play. Instead, the burden is on plaintiff to prove that its mark is a valid
> trademark, this necessarily implies that plaintiff must bear the burden of proving
> that its unregistered mark is not generic.

*Id.* This remains a showing that, as noted above, both parties have failed to make.

The Court further finds that the parties' characterizations of the record evidence
concerning the MOKE mark's distinctiveness prove wanting. Both Plaintiff and Defendants
repeatedly assert that the record stands devoid any facts suggesting that the MOKE mark is

36

generic, and specifically, devoid of any evidence that prospective purchasers understand MOKE as synonymous with a type or style of vehicle. While the Court agrees to a limited extent, in that the record contains no consumer survey evidence of genericness, the Court disagrees to the extent that the parties suggest or imply that Don Racine's testimony sheds no light whatsoever on how the MOKE mark is perceived in the marketplace.

Don Racine, former owner and CEO of Plaintiff's purported predecessor-in-interest, Mini Mania, serves as more than a purveyor of Moke parts. He is equal parts Moke enthusiast and Moke consumer himself. (Tr. 8:23–9:2) ("Mr. Racine has flown here from California to testify . . . about Mini Mania . . . , because cars and the MOKE brand isn't [sic] just his livelihood, but it's [sic] his passion and hobby.") And Racine's testimony could easily be interpreted as reflecting his understanding of MOKE as a generic term. On that point, the Court finds it telling that Racine repeatedly referred to vehicles manufactured by disparate, unrelated companies as "Mokes." Far from reserving the term "Moke" for (1) Mini Mania and/or (2) Plaintiff, Racine referred to vehicles produced by (3) BMC and (4) an unnamed Chinese company as "Mokes" as well. (Tr. 27:8–13; 37:16–18.) And though Racine could not definitively testify as to whether the Mokes produced in Australia and Portugal were in fact manufactured by bona fide corporate successors to BMC, Racine expressed no hesitancy in referring to (5) those vehicles as "Mokes" too.

The Court acknowledges that Racine was not qualified as an expert witness on either the etymology or consumer perception of the word "Moke." Nonetheless, Racine no doubt fancies himself a prolific consumer of all things MOKE, and his testimony constitutes the evidence on which the parties chose to proceed. For the parties to suggest that the record contains no

evidence of consumers' perception of the mark simply ignores how Racine's testimony conveys his understanding of the MOKE mark in the American marketplace.

Finally, Defendants' references to prior decisions of the USPTO regarding the MOKE mark fail to demonstrate the mark's distinctiveness, for several reasons. (Pl.'s Resp. Br. at 8–11.)  For one, the Court must undertake an independent analysis of the MOKE mark as presented in this particular case. *See In re Shinnecock Smoke Shop*, 571 F.3d 1171, 1174 (Fed. Cir. 2009) ("Applicant's allegations regarding similar marks are irrelevant because each application must be considered on its own merits."); *In re Nett Designs, Inc.*, 236 F.3d 1339, 1342 (Fed. Cir. 2001) ("Even if some prior registrations had some characteristics similar to Nett Designs' application, the [US]PTO's allowance of such prior registrations does not bind the [TTAB] or this court."). For another, comparisons to registration proceedings before the USPTO's trademark examiners prove inapt to the extent that the burden in such proceedings lies not with the applicant, but with the examiner. *In re Cordua Restaurants, Inc.*, 823 F.3d 594, 600 (Fed. Cir. 2016) ("[I]n registration proceedings[,] the PTO always bears the burden of proving genericness by clear and convincing evidence."). And for a third, as it concerns Defendants' still-pending 2015 application — to which the Examining Attorney raised no genericness objection — the Court again notes that it possesses a factual record that was not before the Examining Attorney when he reviewed the mark. The examiner's failure to raise a genericness objection thus tells the Court little in the current context, where again, the Court "must evaluate the evidence in the present record to determine whether" the mark proves valid and protectable. *Id.*

### *The Court's Evolution from a Finding of Descriptiveness to Genericness*

That the Court initially adjudged the MOKE mark descriptive, only to now find that the mark properly belongs in the generic category, warrants an explicit recapitulation of the procedural slough that landed the analysis where it now sits.  In that vein, the common thread

38

throughout the case has been the parties' shared failure to address the mark's distinctiveness in a straightforward fashion. Recall that neither party posited the MOKE mark's placement along the distinctiveness spectrum — a matter on which both bore an affirmative burden of proof — before trial. Then, at trial, Defendants combatted Plaintiff's assertion of common law trademark rights by arguing, albeit implicitly, that the mark belongs to the descriptive category.[18] This argument prompted Plaintiff to raise the mark's distinctiveness as a triable issue for the first time as well. In light of this newfound dispute, and in an abundance of caution, the Court refrained from issuing findings of fact and conclusions of law in the immediate aftermath of trial, instead ordering supplemental briefing. (ECF No. 270.)

After considering the parties' supplemental briefs, the Court then made its initial finding as to the mark's distinctiveness, finding the mark descriptive. The Court accompanied this descriptiveness finding with the explicit caveat, however, that there existed "a pretty compelling argument" that the mark could in fact prove generic.[19] Because Defendants had not yet presented their case-in-chief as to their common law trademark rights, and because the Court's descriptiveness finding now dictated that Defendants could prevail only by showing secondary meaning, the Court then scheduled resumed trial dates, to be preceded by a brief discovery period for the parties to gather evidence concerning secondary meaning and the mark's distinctiveness. (ECF No. 277.)

The events that immediately followed are key to understanding the Court's evolution to a finding of genericness. Three days after the Court set dates for the resumption of trial, the Fourth Circuit issued its published opinion in *Interprofession*, devoting substantial analysis to the

---

[18]     *See supra* Section II.

[19]     Telephonic Status Conference Tr. (ECF No. 278) 4:21–23, Feb. 27, 2023.

genericness issue and finding that the contested mark in that case, GRUYERE, proved generic where "cheese consumers in the United States understand [the mark] to refer to a type of cheese." 61 F.4th at 426. That decision prompted the Court to undertake additional and extensive study of the distinctiveness issue.

A short while later, the parties submitted briefs, as ordered by the Court, in anticipation of the resumed trial. As noted in Section II, Defendants' brief spurned the opportunity to present any evidence as to secondary meaning. (ECF No. 284.) Instead, Defendants argued that no such evidence was necessary, as the MOKE mark fell within the arbitrary category of marks. This change in position, when coupled with the parties' failure to address the mark's distinctiveness before trial and Defendants' refusal to present any evidence of distinctiveness, led the Court to approach Defendants' argument as to the mark's typology with a great deal of skepticism. And against this backdrop, the Court's independent analysis of the MOKE mark led it to the conclusion explained at length in the pages above — that the mark ultimately proves generic in nature.

Note that even if the Court found the MOKE mark descriptive, however, the outcome of the parties' dispute would not change. Neither side proffered evidence that the MOKE mark possesses secondary meaning in its hands. Incredibly, Defendants thrice declined the Court's invitation to do so.[20] Because neither side has shown secondary meaning, neither side would have carried their burden to demonstrate ownership of the mark even if it were descriptive. *Pro-*

---

[20]      As noted immediately above, Defendants declined the opportunity to present evidence of secondary meaning at a resumed trial, instead taking the position that the mark is arbitrary. (ECF No. 284.) Defendants then confirmed their decision to rest their case as to their common law ownership rights in a March 13, 2023 status conference. (ECF No. 287.) Finally, at the outset of the April 24 hearing on Plaintiff's Rule 52 motion, Defendants again reaffirmed that they wished to present no evidence as to secondary meaning. (Hr'g Tr. 3:14–18.)

*Concepts*, 2013 WL 5741542, at *6.  In the absence of an ownership showing from either party,

the Court would resolve all six counts in a fashion identical to the resolution laid out in the

forthcoming pages, as the lack of common law ownership on both sides drives the result as the

case currently stands.

### *Summary*

The salient takeaway from all of the above — the cornerstone on which the Court's

decision rests — proves simple:  this case turns on the burden of proof.  Plaintiff and Defendants

alike shoulder a burden to prove, by a preponderance of the evidence, that they possess common

law trademark rights in the MOKE mark.  *Synergistic Int'l*, 470 F.3d at 171.  Such a showing

entails proving (1) priority of use of (2) a valid, protectable trademark.  *George & Co.*, 575 F.3d

at 400.  Without proving ***both elements***, neither party can prevail on their respective trademark

infringement claims or their respective actions for a declaration of trademark ownership rights.

The parties chose to present very little evidence on the second half of the ownership equation, all

but assuming that the Court would find the MOKE mark inherently distinctive.  While the Court

again acknowledges that sorting trademarks into the appropriate distinctiveness bucket is no easy

task, the Court cannot find, on the record before it, that either party has demonstrated that the

relevant consuming public associates the MOKE mark with their products.  The limited record

before the Court, to the extent probative, in fact suggests the opposite — that consumers see the

mark as synonymous with a style of vehicle produced by one or more non-party entities a

century ago.  Based on the record evidence, the Court thus concludes that the MOKE mark, as

used in connection with the parties' vehicles, is generic.  *OBX-Stock*, 558 F.3d at 340.  The mark

therefore falls beyond the ambit of trademark protection.  *Retail Servs., Inc. v. Freebies Publ'g*,

364 F.3d 535, 538 (4th Cir. 2004) ("Because a generic mark, by definition, neither signifies the

41

source of goods nor distinguishes the particular product from other products on the market, a generic term cannot be protected as a trademark nor registered as one.").

### *Motion Hearing Postscript*

Before sorting through the impact of the Court's genericness finding on the parties' claims and counterclaims, the Court briefly digresses to address Defendants' arguments during the April 2023 hearing on Plaintiff's Rule 52 motion. During the hearing, Defendants asserted that the Court could not find the MOKE mark generic or descriptive where the parties had previously agreed that the mark possesses inherent distinctiveness. (Hr'g Tr. 5:7–19.) The Court invited Defendants to identify where in the record the parties stipulated to the mark's distinctiveness, and Defendants could not point to any filing containing such a stipulation, instead directing the Court's attention to Plaintiff's arguments in its post-trial briefing and the Court's own statements during trial. (Hr'g Tr. 5:15–6:7; 21:21–22:13.) Defendants specifically pointed to the following statement of the Court near the conclusion of trial:

> Now, going back, then, to [Defendants'] Count Two, because the parties have stipulated to all the elements of trademark infringement outside of the ownership as reflected in paragraph 4 of the parties' joint stipulation . . . and the Court's final pretrial order, and because the parties have stipulated to the defendants' priority date as of August 10th of 2015, I also find that the defendants prevail on their counterclaim for trademark infringement.

(Tr. 107:11–19.) This statement, Defendants contend, demonstrates that priority of use constituted the only issue to be decided at trial; thus, Defendants argue, the validity of the mark was necessarily resolved before that stage.

Defendants' effort to tie the Court's hands with its prior statement, though clever, fails to demonstrate that the parties stipulated or that the Court must find that the mark is inherently distinctive. Instead, the Court's statement, when read in the context of how the parties framed the case before trial, reflects that the parties all but ignored a key element of common law

42

trademark ownership — an element on which each party bears an affirmative burden of proof —

until that very element came to the fore at the conclusion of the January proceedings.  As noted

in Section II, Plaintiff's pretrial briefs framed the ownership question as turning solely on which

party rightfully claimed priority of use.[21]  Defendants did not contest this framing, couching their

argument regarding the nature of Mini Mania's use of the mark as also speaking to priority of

use.  The Court initially ruled from the bench *in light of this framing*, before later recognizing the

parties' failure to establish that the mark constitutes a valid, protectable mark.

       Only after Plaintiff raised its eleventh-hour objection did the Court recognize that

Defendants' chief argument at trial spoke not to which party rightfully asserted priority of use,

but rather to the MOKE mark's validity as a trademark in the first instance.  The Court therefore

ordered additional briefing and, although Defendants declined the invitation, also provided

Defendants an opportunity to produce further evidence as to the mark's validity.  Now, given the

parties' supplemental briefing on the issue; given the Fourth Circuit's recent decision in

*Interprofession*; and given the Court's additional research on the nature of common law

trademark rights, the Court again observes that the parties have failed to put forth sufficient

evidence for the Court to find, by a preponderance, that members of the consuming public

associate the MOKE mark with either of their products.  Defendants, like Plaintiff, clearly

---

[21]    In its pretrial brief (ECF No. 255), Plaintiff painted priority of use as dispositive to the
case:

> Whoever has priority of use of the MOKE trademark is the owner of the mark.
> The owner has the right to register the mark and can use the mark without being
> liable to the other party for trademark infringement.  In contrast, the non-owner
> does not have the right to register the mark, and use of the mark in commerce by
> the non-owner in connection with automotive products constitutes infringement.

(ECF No. 255 at 3.)

believe that merely pointing to the dictionary definition of "Moke" proves sufficient to show that the mark possesses inherent distinctiveness. The Court finds, as a matter of fact and law, that such evidence proves insufficient to demonstrate by a preponderance that the mark is non-generic. The facts in the record largely suggest that the MOKE mark proves synonymous with a style of vehicle first popularized by BMC and now imitated by various companies across the globe, including the parties to this suit. MOKE denotes certain stylistic qualities; it does not signify source or origin. MOKE is thus a generic term, undeserving of trademark protection, and Defendants' late effort at papering over their failure to establish the MOKE mark's validity proves ineffective.

### Implications of the Court's Genericness Finding

As alluded to above, the Court's finding that the MOKE mark proves generic as applied to the parties' vehicles carries with it several implications. First and foremost, the Court must withdraw its prior finding as to the MOKE mark's typology. The Court will therefore modify its February 27 Memorandum Scheduling Order (ECF No. 277), pursuant to Rule 54(b), to state that it finds the MOKE mark generic, as opposed to descriptive.

Second, the Court must assess the impact of its genericness finding on the outcome of each claim and counterclaim, beginning with those claims that it previously adjudicated at the close of trial via Defendants' oral motion for judgment on partial findings. Taking up Plaintiff's three claims first, recall that at trial, the Court ruled against Plaintiff on all three counts, finding that Plaintiff's failure to prove priority of use required, as Plaintiff stipulated that it would, a judgment against Plaintiff on all three of its claims. Returning to those claims, the Court will leave its prior adjudication undisturbed as to two of them, while reversing course as to the third. Concerning Plaintiff's actions for a declaration of trademark ownership (Count II) and trademark

infringement (Count III), the Court reaffirms its judgment against Plaintiff. Plaintiff cannot assert common law ownership rights to the MOKE mark, as MOKE is a generic term. Without demonstrating ownership rights to the contested mark, Plaintiff cannot prevail in a trademark infringement action or receive a declaratory judgment of trademark ownership. Accordingly, judgment on partial findings against Plaintiff as to Counts II and III of the Amended Complaint (ECF No. 20) remains appropriate.

As to Plaintiff's appeal of the TTAB's April 2020 opinion (Count III), however, the Court will modify its post-trial Order (ECF No. 270) and enter judgment for Plaintiff. Initially, and again based on Plaintiff's stipulation that resolving ownership would resolve all its claims, the Court affirmed the TTAB's dismissal of Plaintiff's opposition to Defendants' pending registration. Clearly, the Court must now alter that judgment and reverse the TTAB. MOKE is a generic term, and Plaintiff's opposition to Defendants' pending registration therefore proves meritorious to the extent that either the TTAB or the Examining Attorney found the MOKE mark registrable in connection with Defendants' vehicles. Thus, the Court will amend its post-trial Order, enter judgment for Plaintiff on its appeal of the TTAB, and direct the USPTO to deny Defendants' application for registration of the MOKE mark on the Principal Register.

Resolution of Plaintiff's appeal from the TTAB naturally turns the Court's attention to Defendants' counterclaims, two of which — Counts I and III — the Court also resolved on Defendants' oral Rule 52 motion. Based on its finding that the MOKE mark proves generic, the Court now finds that it must reverse course on these two counts as well. First, the Court will now enter judgment against, rather than for, Defendants in their action for affirmation of the TTAB (Count I). The above paragraph explains why this is necessary. Second, the Court will enter judgment against, rather than for, Defendants in their action for a declaratory judgment of

trademark ownership (Count III).  Like Plaintiff, Defendants cannot plausibly assert trademark ownership rights in a generic term, and the Court therefore must enter judgment against Defendants to the extent they seek a declaration of trademark ownership rights to the MOKE mark.  To the extent Count III of Defendant's counterclaims seeks a declaration of non-infringement, however, the Court will reaffirm its prior Order and enter judgment for Defendants.

Finally, having addressed the claims and counterclaims that the Court previously resolved via Defendants' oral Rule 52 motion, the Court can now turn to take up the sole claim not resolved at trial — Defendants' counterclaim for trademark infringement (Count II).  Because the Court finds that the MOKE mark is generic as it concerns both parties' vehicles, the Court will grant Plaintiff's motion for judgment on partial findings and enter judgment against Defendants as to their claim for trademark infringement.  Defendants cannot prevail on their infringement claim without showing trademark ownership, which is an impossible showing with respect to a generic mark.

## IV.    CONCLUSION

For the aforementioned reasons, the Court will GRANT Plaintiff's motion for judgment

on partial findings and enter judgment for Plaintiff on Defendants' action for trademark

infringement (Count II).  Furthermore, the Court will modify its prior Orders (ECF Nos. 270,

277) as detailed in the preceding section.[22]

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all

counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Dated: May 3, 2023

---

[22]    The Lanham Act provides that the prevailing party in a trademark infringement action
under 15 U.S.C. § 1125(a) shall be entitled to an award of attorneys' fees in "exceptional" cases.
15 U.S.C. § 1117(a).  Because neither side has prevailed on its trademark infringement claim
here, the Court will not award attorneys' fees in this case.